UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| LUMENATE TECHNOLOGIES, LP, | : | Case No. 1:14-cv-125 |
| | : | |
| Plaintiff, | : | Judge Timothy S. Black |
| vs. | : | |
| | : | |
| DANIEL BAKER, *et al.*, | : | |
| | : | |
| Defendants. | : | |

## ORDER RESOLVING MOTIONS FOR PARTIAL SUMMARY JUDGMENT
## (Docs. 87, 89, 101)

This civil action is before the Court on: (1) Defendants' motions for partial

summary judgment (Docs. 87, 89); (2) Plaintiff Lumenate's motion for partial summary

judgment (Doc. 101); and the parties' responsive memoranda (Docs. 125, 126, 131, 132,

140, 141, 148).

## I.    BACKGROUND FACTS

Prior to July 2013, the Individual Defendants were employed by Data Processing

Sciences Corporation ("DPS").[1]  (Doc. 1 at ¶ 12).  Mr. Baker, Mr. Hahn, and Mr.

Anderson entered into DPS Non-Compete Agreements ("DPS Agreements").  (Doc. 63,

Exs. 1-3).  In July 2013, Lumenate entered into an Asset Purchase Agreement ("APA")

with DPS pursuant to the terms of which Lumeante purchased substantially all of DPS's

assets.  (Doc. 1 at ¶ 19).  According to the APA's terms, DPS terminated Mr. Baker, Mr.

Hahn, and Mr. Anderson.  (*Id.* at ¶ 20).

---

[1]  Defendants include Daniel Baker, Christopher Anderson, William Hahn, Bronson Trebbi
(collectively, "Individual Defendants"), and RDI Marketing (collectively, "Defendants").

In July 2013, coinciding with their terminations from DPS, Lumenate offered Mr. Baker and Mr. Anderson positions with Lumenate.  As part of that offer, Lumenate presented them with a form "Confidentiality, Non-Solicitation and Intellectual Property Agreement" ("Lumeante Agreement").  Among other things, the Lumenate Agreement included a non-solicitation and non-competition provision.  (Doc. 63, Ex. 5).  Mr. Baker and Mr. Anderson each executed a Lumenate Agreement at the end of August 2013.  (*Id.*, Exs. 5-6).  Mr. Baker and Mr. Anderson were both employed by Lumenate until they left in November 2013.

Both parties move for partial summary judgment related to Claim Three in the Second Amended Complaint.[2]  Lumenate argues that there is no genuine issue of material fact that the Individual Defendants breached their DPS Agreements.  Defendants request a determination by this Court that, as a matter of law: (1) any contractual relationship between Mr. Baker and Lumenate is set forth in Mr. Baker's Lumenate Agreement; and (2) Mr. Baker and Mr. Anderson's Lumenate Agreements did not and do not preclude them from soliciting their former DPS clients.

---

[2] In the Second Amended Complaint, Lumenate alleges claims for: Conspiracy (Count One), Misappropriation of Trade Secrets (Count Two), Breach of Non-Compete Agreements (Count Three), Tortious Interference with Contractual Relations (Counts Four and Five), Tortious Interference With Business Relations (Count Six), Breach of Fiduciary Duty (Count Seven), Unfair Competition (Count Eight), Unjust Enrichment (Count Nine), Computer Fraud and Abuse Act (Count Ten), and Conversion (Count Eleven).  (Doc. 63).

## II.    PLAINTIFF'S UNDISPUTED FACTS[3]

1.    Defendant Daniel Baker was an employee of DPS's managed services business. (Doc. 63, Ex. 1; Doc. 34 at 37).

2.    Defendant William Hahn was an employee of DPS's managed services business. (Doc.  63, Ex. 3; Doc. 32 at 40).

3.    Christopher Anderson was an employee of DPS's managed services business. (Doc. 63, Ex. 2; Doc. 33 at 19-20).

4.    Baker, Hahn, and Anderson entered into DPS Non-Compete Agreements. (Doc. 63, Exs. 1-3).[4]

5.    Hahn signed the DPS Agreement, but it was not initially countersigned by DPS. (Doc. 96, Exs. 4, 47).

6.    Hahn worked as a DPS employee for approximately 16 years after he signed his DPS Agreement.  (Doc. 63, Ex. 3; Doc. 32 at 40).

7.    Lumenate purchased DPS assets pursuant to an Asset Purchase Agreement ("APA") dated July 31, 2013.  (Doc. 63, Ex. 4).

8.    The APA assigned Baker, Hahn, and Anderson's DPS Agreements to Lumenate. (Doc. 63, Ex. 4 at § 5.4).

9.    After Lumenate purchased DPS's assets, it offered Baker, Hahn, and Anderson continued employment.  (Doc. 34 at 37; Doc. 32 at 40; Doc. 33 at 77-78).[5]

10.    Hahn refused Lumenate's employment offer, resigned his position, and shortly thereafter became employed by RDI.  (Doc. 32 at 40-41, 44).

11.    Baker accepted Lumenate's offer of employment.  (Doc. 34 at 37).

---

[3] *See* Doc. 101, Ex. 1 and Doc. 131, Ex. 6

[4] Defendants dispute the enforceability of the DPS Agreement.

[5] Defendants dispute that Baker, Hahn, and Anderson were offered "continued employment with Lumenate," to the extent the statement implies that they had previously been employed by Lumenate.  (Doc. 96 at 22).  Defendants do not dispute that they were offered employment with Lumenate after its purchase of DPS's assets.

12. As a condition of his employment, Baker was presented with a Lumenate Confidentiality, Non-Solicitation, and Intellectual Property Agreement ("Lumenate Agreement"). (Doc. 63, Ex. 5).[6]

13. Baker attached an Addendum A to his Lumenate Agreement, which listed those customers that Baker did not want to be restrained from soliciting, signed the agreement, and presented it to Lumenate. (Doc. 63, Ex. 5; Doc. 34 at 85-86).[7]

14. Lumenate did not countersign Baker's Lumenate Agreement with the attached Addendum A. (Doc. 63, Ex. 5; Doc. 99 at 96-99; Doc. 34 at 85- 87).

15. Baker resigned his position with Lumenate after about two months and became employed by RDI. (Doc. 34 at 37).

16. Anderson accepted Lumenate's offer of employment. (Doc. 92 at 181).

17. As a condition of his employment, Anderson was presented with a Lumenate Agreement. (Doc. 63, Ex. 6; Doc. 92 at 181).[8]

18. Anderson did not list any customers on his Lumenate Agreement Addendum A, but instead signed the agreement and presented it to Lumenate. (Doc. 63, Ex. 6; Doc. 92 at 181).[9]

---

[6] Defendants do not dispute this fact, except insofar as the statement implies that the "present[ation]" to Baker of his Lumenate Agreement was not also an offer of its terms. Defendants contend that when Lumenate "presented" Baker with the Lumenate Agreement, it was an offer that he subsequently accepted consistent with its terms.

[7] Defendants do not dispute this fact, except insofar as there is any implication that Baker's "present[ation]" of his Lumenate Agreement did not constitute acceptance of Lumenate's offer. Defendants contend that when Baker "presented" Lumenate with the signed Agreement and completed Addendum A, it constituted acceptance of Lumenate's offer consistent with its terms.

[8] Defendants do not dispute this fact, except insofar as the statement implies that the "present[ation]" to Anderson of his Lumenate Agreement was not also an offer of its terms. Defendants contend that when Lumenate "presented" Anderson with the Lumenate Agreement, it was an offer that he subsequently accepted consistent with its terms.

[9] Defendants do not dispute this fact, except insofar as there is any implication that Anderson's "present[ation]" of his Lumenate Agreement did not constitute acceptance of Lumenate's offer. Defendants contend that when Anderson "presented" Lumenate with the signed Lumenate Agreement, it constituted acceptance of Lumenate's offer consistent with its terms.

19.  Lumenate did not countersign Anderson's Lumenate Agreement before Anderson resigned from Lumenate.  (Doc. 63, Ex. 6; Doc. 92 at 181).

20.  In March 2013, Baker discussed with Bronson Trebbi, RDI Marketing Services, Inc. ("RDI") CEO, and Scott Monahan, RDI's Director of Corporate Development, a potential acquisition of DPS's managed services business.  (Doc. 108, Ex. 523).

21.  Baker provided Trebbi and Monahan with profit and value estimates for DPS. (Doc. 108, Ex. 523; Doc. 100 at 127-29).

22.  DPS rejected RDI's offer, and stated that the managed services portion of DPS's business was valued at "north of $3.5MM" because the company was privately held "and financial information on our company is scarce."  (Doc. 108, Ex. 526).[10]

23.  In September 2013, Baker and Trebbi discussed creating a managed services business at RDI to compete with Lumenate.  (Doc. 34 at 25).[11]

24.  RDI sells products or services comparable to or competitive with products or services that were provided by DPS and which are now provided by Lumenate. (Doc. 34 at 45-46).

25.  RDI is located in or sells products or services within fifty miles of the "Territories" as defined in the DPS Agreements.  (Doc. 34 at 7).

26.  Within six months after his date of termination from DPS and Lumenate, Baker was in the employ of RDI.  (Doc. 34 at 37).

27.  Within six months after his date of termination from DPS and Lumenate, Hahn was in the employ of RDI.  (Doc. 32 at 40, 44).[12]

---

[10] Defendants do not dispute these facts, insofar as they reflect what DPS stated in the referenced email, but Defendants do dispute the substance of DPS's assertion as to the valuation and the reasons for its decision to decline to sell to RDI.  (Doc. 108 at 32-36).

[11] Defendants do not dispute this fact as reflected in the referenced documents, but do dispute that the creation of a managed services business at RDI was discussed "to compete with Lumenate." Defendants submit that Mr. Baker's deposition testimony speaks for itself.

[12] Defendants do not dispute this fact, except insofar as it is undisputed that Hahn did not accept employment from Lumenate and was never employed by Lumenate.

28.    Within six months after his date of termination from DPS and Lumenate, Anderson was in the employ of RDI.  (Doc. 33 at 19-20).

29.    Baker solicited Hahn to join RDI.  (Doc. 111 at 54-55, 56; Doc. 109 at 175).[13]

30.    Baker and Hahn solicited Gary Newman, a DPS and Lumenate employee, to join RDI.  (Doc. 112 at 84-85, 88, 90, Ex. 221; Doc. 109 at 157-158).[14]

31.    In his new position, Newman worked for RDI and provided managed IT services to Adams County Regional Medical Center - the same position he had while working in DPS and Lumenate's managed services division.  (Doc. 111 at 116, 89).

32.    Baker solicited Anderson to join RDI.  (Doc. 107 at 113, 115-116).[15]

33.    Hahn solicited Anderson to join RDI.  (Doc. 33 at 21-22; Doc. 92 at 115-116).[16]

34.    Hahn solicited the following DPS and Lumenate employees to join RDI: Rusty Opper, Kevin Singleton, and Kevin Rast.  (Doc. 32 at 37; Doc. 91, Ex. 255).[17]

35.    Anderson solicited the following DPS and Lumenate employees to join RDI: Kevin Rast and Kevin Singleton.  (Doc. 92 at 237-238; Exs. 453, 446, 421).[18]

36.    Baker solicited the following DPS/Lumenate customers that he listed on

---

[13]  Defendants dispute the characterization of this fact and submit that the deposition testimony speaks for itself.

[14]  Defendants dispute the characterization of this fact and submit that the deposition testimony speaks for itself.

[15]  Defendants dispute the characterization of this fact and submit that the deposition testimony speaks for itself.

[16]  Defendants dispute characterization of this fact and submit that the deposition testimony speaks for itself.

[17]  Defendants dispute the characterization of this fact and submit that the deposition testimony speaks for itself.

[18]  Defendants dispute the characterization of this fact and submit that the deposition testimony speaks for itself.

Addendum A of the Non-Compete Agreement he presented to Lumenate: Cincinnati Eye Institute, HealthPoint, Primary Health Network, TriState Gastroenterology, Healthsource of Ohio, Catholic Health Partners, Goldsboro Pediatrics, RDI Marketing, Cardinal Orthopedics, Cornerstone Care, Christ Hospital, VRI, and TriState Orthopedics.  (Doc. 94 at 230).

37.    Hahn, Anderson, and Newman assisted Baker's solicitations.  (Doc. 94 at 41).[19]

38.    Anderson solicited DPS/Lumenate customers by providing information on RDI to DPS/Lumenate customers.  (Doc. 33 at 114-116).[20]

39.    Anderson solicited the following DPS and Lumenate customers to join RDI: UroPartners, Catholic Health Partners, and MedCentrix.  (Doc. 33 at 114-116).[21]

40.    Hahn solicited the following DPS and Lumenate customers to join RDI: MedCentrix and PHN.  (Doc. 32 at 49-51; Doc. 91 at 158-60, Ex. 221).[22]

41.    Hahn solicited Lumenate customers UroPartners, Catholic Health Partners, and HealthPoint.  (Doc. 32 at 54-57; Doc. 91, Ex. 221).[23]

42.    Baker, Hahn, and Anderson each had an integral relationship with the DPS and Lumenate customers they solicited.  (Doc. 91 at 213-14, 215-17; Doc. 32 at 72-73; Doc. 112 at 21; Doc. 34 at 9-11).

43.    The following DPS and Lumenate customers left and went to RDI: Catholic Health Partners, MedCentrix, UroPartners, Adams County Regional Medical Center, Primary Health Network, and Goldsboro Pediatrics.  (Doc. 34 at 9-13).

---

[19]  Defendants dispute the characterization of this fact and submit that the deposition testimony speaks for itself.

[20] Defendants dispute the characterization of this fact and submit that the deposition testimony speaks for itself.

[21] Defendants dispute the characterization of this fact and submit that the deposition testimony speaks for itself.

[22] Defendants dispute the characterization of this fact and submit that the deposition testimony speaks for itself.

[23] Defendants dispute the characterization of this fact and submit that the deposition testimony speaks for itself.

44. The following DPS and Lumenate customers left but did not go to RDI: Cincinnati Eye Institute, Cardinal Orthopedics, Tri-State Gastroenterology Associates, Tri-State Orthopaedic. (Doc. 34 at 9-13).

45. Baker retained confidential DPS/Lumenate documents and used those documents to compete with Lumenate. (Doc. 94, Exs. 70, 49; Doc. 34 at 58, 76, 95-96; Doc. 114, Ex. 369).[24]

46. Hahn retained confidential DPS/Lumenate documents and used those documents to compete with Lumenate. (Doc. 32 at 5-9; Doc. 91 at 105-108, Ex. 261).[25]

47. Anderson retained confidential DPS/Lumenate documents and used those documents to compete with Lumenate. (Doc. 92 at 318, 358-359; Doc. 33 at 31-48, 66-69, 96-102, 106, 128-29).[26]

## III. DEFENDANTS' UNDISPUTED FACTS RELATED TO THE LUMENATE AGREEMENT[27]

1. Prior to July 2013, Defendants were employed by DPS. (Doc. 1 at ¶ 12).

2. In July 2013, Lumenate entered into an Asset Purchase Agreement ("APA") with DPS. (Doc. 1 at ¶ 19, Ex. D). According to the APA's terms, DPS terminated Mr. Baker, Mr. Hahn, and Mr. Anderson as DPS employees on the closing date of the APA. (*Id.* at ¶ 20).

3. In July 2013, coinciding with their termination from DPS, Lumenate offered Mr. Baker and Mr. Anderson positions with Lumenate. (Doc. 87, Ex. 2 at ¶ 3; Ex. 3 at ¶ 3). As part of that offer, Lumenate presented Mr. Baker and Mr. Anderson with the Lumenate Agreement.

---

[24] Defendants dispute the characterization of this fact and submit that the deposition testimony speaks for itself.

[25] Defendants dispute the characterization of this fact and submit that the deposition testimony speaks for itself.

[26] Defendants dispute the characterization of this fact and submit that the deposition testimony speaks for itself.

[27] *See* Doc. 87, Ex. 1 and Doc. 125, Ex. 1.

4.   Among other things, the Lumenate Agreement included a non-solicitation and non-competition provision: "[T]he Employee agrees that, during the Employee's employment and for a period of twelve (12) months after cessation of the Employee's employment with the Employer for any reason, the Employee agrees not to directly or indirectly through third parties solicit the business of, or engage in business with, the Employer's clients, vendors, customers, employees or other companies, individuals or entities with whom the Employer conducts business." (Doc. 63, Ex. 5 at PageID 1630).

5.   The Lumenate Agreement states that "[t]his restriction is limited to (a) those persons, companies and other entities that the Employee first came into contact with, or learned about the existence of, while working for the Employer . . ." (Doc. 63, Ex. 5 at PageID 1630).[28]

6.   The Lumenate Agreement also directed the employee "to identify in Addendum A, attached hereto and incorporated by reference, clients…with whom the Employee has had relationships with prior to his or her employment with the Employer." (Doc. 63, Ex. 5 at PageID 1630-31). The Lumenate Agreement then confirms that "[t]he Employee is not restrained from soliciting or engaging in business with these clients." (*Id.* at PageID 1631).[29]

7.   At the end of August 2013, Mr. Baker and Mr. Anderson each executed a Lumenate Agreement. (Doc. 63, Ex. 5 at PageID 1632; Ex. 6 at PageID 1637). Additionally, in accordance with the instruction set forth in the previous paragraph, Mr. Baker completed an "Addendum A," identifying companies with whom he had relationships with prior to his employment with Lumenate. (Doc. 63, Ex. 5 at PageID 1633; Doc. 87, Ex. 2 at ¶ 6).

8.   Mr. Baker returned his completed Lumenate Agreement to Lumenate on August 28, 2013. (Doc. 87, Ex. 2 at ¶ 8). Mr. Anderson also completed his Lumenate Agreement, and returned it to Lumenate in August 2013. (*Id.*, Ex. 3 at ¶ 8).

9.   Following the execution and return of their Lumenate Agreements, Mr. Baker and Mr. Anderson were both employed by Lumenate until their departure in November 2013. (Doc. 87, Ex. 2 at ¶ 8; Ex. 3 at ¶ 8).

---

[28] Lumenate argues that this provision does not represent the full extent of the limitation on non-compete obligations. (Doc. 63, Ex. 5 at PageID 1630-31, 1633; Ex. 6 at PageID 1635-36, 1638).

[29] Lumenate argues that this provision does not represent the full extent of the limitation on non-compete obligations. (Doc. 63, Ex. 5 at PageID 1630-31, 1633; Ex. 6 at PageID 1634-36, 1638).

10. Lumenate drafted the Lumenate Agreement proposed to Baker and Anderson. (Doc. 96, Exs. 49, 53; Doc. 87, Ex. 2 at ¶ 4; Doc. 87, Ex. 3 at ¶ 4).

11. Lumenate sent Mr. Baker a letter in January 2014 threatening him with legal action related to his ongoing business activities with RDI. (Doc. 39, Ex. 7 at PageID 1114-1120).

12. At least nine other former DPS employees completed Lumenate Agreements with Addendum A's that included former DPS clients. (Doc. 96 at Ex. 68). One of those employees was Kurt Loock, DPS's President and subsequent senior Lumenate executive. Mr. Loock listed "DPS Client List," "DPS Vendor List," and "DPS Business Partners" on his Addendum A. (Doc. 98, Ex. 244 at 4). Mr. Loock testified that his DPS relationships were "pre-existing relationships that [he] wanted to protect for [his] benefit" and could thus identify on his Addendum A. (Doc. 98 at 152-153).

## IV. DEFENDANTS' UNDISPUTED FACTS RELATED TO THE DPS AGREEMENT[30]

1. Prior to July 2013, Defendants were employed by DPS. (Doc. 1 at ¶ 12).

2. Defendants each executed Non-Disclosure and Non-Competition Agreements with DPS ("DPS Agreements"). (Doc. 63, Ex. 2 at PageID 1618; Ex. 1 at PageID 1616; Ex. 3 at PageID 1620).

3. Mr. Baker's DPS Agreement was not countersigned by DPS. (Doc. 63, Ex. 1 at PageID 1616).

4. Mr. Anderson's DPS Agreement was not countersigned by DPS. (Doc. 63, Ex. 2 at PageID 1618).

5. In July 2013, Lumenate entered into an Asset Purchase Agreement ("APA") with DPS. (Doc. 1 at ¶ 19, Ex. D). According to the APA's terms, DPS terminated Mr. Baker, Mr. Hahn, and Mr. Anderson as DPS employees on the closing date of the APA. (*Id*. at ¶ 20).

6. In July 2013, coinciding with their termination from DPS, Lumenate offered Mr. Baker and Mr. Anderson positions with Lumenate. (Doc. 87, Ex. 2 at ¶ 3; Ex. 3

---

[30] *See* Doc. 89, Ex. 1 and Doc. 126, Ex. 1.

at ¶ 3).  As part of that offer, Lumenate presented Mr. Baker and Mr. Anderson with the Lumenate Agreement.

7.      Lumenate has not paid the $4.5 million purchase price for the DPS assets.  (*See Data Processing Sciences Corp. v. Lumenate Technologies, LP, et al.,* Case No. 1:14-cv-740-WOB (S.D. Ohio), Doc. 1 at ¶ 7).

8.      Lumenate believed that losing the business of certain DPS customers would make its "business stronger."  (Doc. 97, Ex. 137).[31]

## V.      STANDARD OF REVIEW

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  The moving party has the burden of showing the absence of genuine disputes over facts which, under the substantive law governing the issue, might affect the outcome of the action.  *Celotex*, 477 U.S. at 323.  All facts and inferences must be construed in a light most favorable to the party opposing the motion.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

A party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . .  must set forth specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 248 (1986).

---

[31]  Plaintiff denies that the complete implication of Gary Derheim's e-mail is that "Lumenate believed that losing the business of certain DPS customers would make its 'business stronger.'" (Doc. 97, Ex. 137).

# VI.    ANALYSIS

## A.    Lumenate's Motion for Partial Summary Judgment

Lumenate moves for partial summary judgment on the breach of contract claim asserted in Count Three of the Second Amended Complaint related to the DPS Agreement.  Specifically, Lumenate maintains that Baker, Hahn, and Anderson breached their DPS Agreements.  Under the terms of the DPS Agreements, Baker, Hahn, and Anderson were prohibited from competing with DPS, disclosing DPS's confidential information, soliciting or diverting business from DPS customers, being employed by a competing business operating within 50 miles of DPS, or soliciting or hiring DPS employees.  (Doc. 63, Exs. 1-3).

Defendants argue that Lumenate is not entitled to summary judgment because: (1) the DPS Agreement was novated by the Lumenate Agreement; (2) Lumenate cannot enforce the DPS Agreement because it could not be assigned by DPS to Lumenate;[32] (3) Lumenate's subsequent restrictive covenant agreements with Baker and Anderson superseded their DPS Agreements; and (4) Lumenate has not established causation as a matter of law.

Under Ohio law, breach of contract consists of: (1) the existence of a contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) damages.  *See, e.g., Palmer-Donavin Mfg. Co. v. Rheem Sales Co.*, No. 2:14cv91, 2014 U.S. Dist. LEXIS

---

[32] For the reasons stated *infra* at Section VI.C.1, the DPS Agreement was assignable.

82993, at *10 (S.D. Ohio 2014) (citing *Doner v. Snapp*, 649 N.E.2d 42 (Ohio App. 1994)).

### 1. Whether the DPS Agreements were novated by the Lumenate Agreements[33]

Defendants argue that the DPS Agreements were novated by the subsequent Lumenate Agreements and therefore Lumenate cannot succeed on a breach of contract claim. "A contract of novation is created where a previous valid obligation is extinguished by a new valid contract, accomplished by substitution of parties or of the undertaking, with the consent of all the parties, and based on valid consideration." *Fitness Experience, Inc. v. TFC Fitness Equip., Inc.*, 355 F.Supp.2d 877, 891 (N.D. Ohio Dec. 17, 2004). "In order for a novation to occur, there must be a clear and definite intent on the part of all parties to the original contract that the purpose of the second agreement is to effect a novation; to completely do away with the original contractual obligation." *Id.* (quoting *Wenner v. Marsh USA, Inc.*, No. 01AP-1211, 2002 Ohio App. LEXIS, 2201 at *7 (Ohio App. May 2, 2002)). "While knowledge and intent need not be express and can be implied from the party's conduct, all parties to the original contract as well as the substituted party must assent to the novation." *Id.* "Whether express or implied, evidence of a party's knowledge and consent must be clear and definite, as a novation will never be presumed." *Id.* "As a general rule, in order to effect a novation involving the introduction of a new party, it is necessary that there be a mutual agreement among

---

[33] Anderson and Baker were the only Defendants to accept the Lumenate Agreement; Hahn did not. Accordingly, this analysis only applies to Baker and Anderson.

the parties to the old and the new obligations whereby the new obligation is substituted for the prior one." *Id.*

Defendants have not satisfied their burden to show clear and definite intent by the parties to a novation.

First, the express language of the Lumenate Agreement does not indicate that it supersedes the DPS Agreement or other restrictive covenants.  (Docs. 63, Exs. 5-6).  If Lumenate and the Defendants "clearly and definitely" intended for the Lumenate Agreement to supersede the DPS Agreement, they could have included language to that effect.  The absence of such language demonstrates that the parties did not intend for a novation to occur.

Second, the Lumenate Agreement and the DPS Agreement cover different subjects.  The DPS Agreement covered the customers that were transferring from DPS to Lumenate, while the Lumenate Agreement covered Lumenate's pre-acquisition clients. (*See, e.g.,* Doc. 87 (acknowledging that the Lumenate Agreement would prevent solicitation of Lumenate clients); Doc. 89 (acknowledging that the DPS Agreement prevents solicitation of DPS clients)).

Third, Defendants' actions show that they believed their DPS Agreements were enforceable even after they signed the Lumenate Agreements, because they would not have concealed their actions if they believed that Lumenate had agreed to a novation. (*See, e.g.,* Doc. 135 at 17, fn 22).

<u>Finally</u>, Lumenate explicitly stated in writing that the Lumenate Agreement would not supersede the DPS Agreement.  (Doc. 96, Ex. 49) ("[A]ttached you will find the New Lumeante Confidentiality, NonSolicitation and Intellectual Property Agreement for your review and signature…. As a reminder, the former DPSciences NonDisclosure and NonCompetition Agreement has been transitioned to Lumenate and will be applicable to Lumenate employment for six months past the point of employment with DPSciences.").

Accordingly, Defendants fail to establish that the DPS Agreement was novated by the subsequent Lumenate Agreement.

### 2.    *Breach of DPS Agreement*

RDI is a direct competitor of DPS/Lumeante, providing managed IT services within fifty miles of DPS/Lumeante.  (Doc. 102 at 45-46).  Baker's resignation from Lumenate was effective on October 31, 2013.  (*Id.* at 37).  He was officially employed by RDI on November 4, 2013, although Lumenate alleges he was secretly working for RDI while still employed at Lumenate as early as March 2013.  (Doc. 102 at 45-46; Doc. 108, Exs. 7, 523).  Hahn's resignation from DPS was effective August 30, 2013.  (Doc. 103, Ex. 2 at 40).  Hahn had accepted a position with RDI three days prior to his resignation. (*Id.* at 46).  Anderson's resignation from Lumenate was effective November 1, 2013, although he was secretly working for RDI while still employed at Lumenate as early as October 5, 2013.  (Doc. 104 at 19-20; Doc. 107, Exs. 6, 410).  Anderson was officially employed by RDI three days later on November 4, 2013.  (Doc. 104, Ex. 3 at 19-20).

### a.    Solicitation of DPS/Lumenate customers

Baker disclosed DPS financial information to RDI's CEO and RDI's Director of Corporate Development in order to facilitate RDI's attempt to purchase DPS's managed services business.  (Doc. 108, Exs. 7, 523).  When this failed, Baker solicited and encouraged RDI to hire Hahn and Anderson to create a managed services business to compete with DPS/Lumenate.  (Doc. 111, Ex. 10 at 54-55; Doc. 107, Ex. 6 at 113).  Baker admitted to soliciting a number of DPS's customers.  (Doc. 109, Ex. 8 at 230; Ex. 18 ("Just had 'the talk' with Sonya, our CHP contact.  Told her what was up and she wants a contract from us…like now."); Ex. 19 ("Our lawyer reviewed and this is the exact same contract that you have on file with DPS[.]")).

Hahn admitted to contacting Lumenate customers after he left DPS/Lumenate but before they became customers of RDI, and his emails detail his solicitations of DPS/Lumenate customers.  (Doc. 103, Ex. 2 at 49-51; Ex. 221).  Anderson admitted helping Baker's solicitation efforts by providing information on RDI's service offerings to current DPS/Lumenate customers.  (Doc. 104, Ex. 3 at 114-116).

### b.    Solicitation of DPS/Lumenate employees

Baker and Hahn solicited and encouraged Gary Newman and Anderson to leave DPS.  (Doc. 112, Ex. 11 at 84-85; Doc. 111 at 54-56; Doc. 107 at 113; Doc. 112 at 88, 90; Doc. 107 at 115-116; Doc. 109, Ex. 221).  Baker, Hahn, and Anderson were involved in soliciting former DPS employees Kevin Singleton, Kevin Rast, Nicholas Bowman, and Rusty Opper to join RDI.  (Doc. 103 at 37; Doc. 107 at 237-238).

16

### c. Baker, Hahn, and Anderson used and retained DPS/Lumenate confidential information

Baker, Hahn, and Anderson also retained confidential information that they used to service customers that they took from Lumenate. Specifically, Baker used DPS engagement documents to create engagement documents for RDI. (Doc. 102 at 58, 76, 95-96). Baker also received DPS/Lumenate invoices that he used to create invoices while at RDI (Doc. 114, Exs. 13, 369). Hahn admitted to retaining DPS documents and forwarded himself DPS documents to be used as templates for documents to be created at RDI. (Doc. 103 at 5-9, 105-108). Anderson admitted to retaining an external hard drive of DPS/Lumeante documents and accessing it often after starting at RDI. (Doc. 107 at 318, 358-359; Doc. 104, at 31-48, 66-69, 96-102, 106, 128-29).

Accordingly, it is clear that Baker, Hahn, and Anderson breached the terms of the DPS Agreement.

### 3. Causation

An essential element of a claim for breach of contract is proof that a plaintiff "incurred damages as a result of the [defendant's] failure" to perform its contractual obligations. *Arlington Video Prods. v. Fifth Third Bancorp*, 569 F. App'x 379, 385-86 (6th Cir. 2014). Therefore, before Defendants can be found liable for breach of the DPS Agreement, Lumenate must prove by a preponderance of the evidence that any breach by Defendants in fact caused the damages Lumenate seeks to recover. Lumenate claims that as a result of Defendants' breaches of the DPS Agreement, Lumenate lost revenue from

approximately a dozen managed services customers. (Doc. 115 ). Defendants argue that there is no direct evidence in the record that causally connects any breach of contract by Defendants to any damage suffered by Lumenate.[34]

"In *Chicago Title*, damages were proximately caused by Magnuson's breach of his non-compete agreement because Magnuson solicited his former co-workers while under the non-compete and customers left while Magnuson was under the non-compete." *Lawyers Title Co v. Kingdom Title Solutions, Inc.*, 592 F. App'x 345, 350 (6th Cir. 2014) (citing *Chicago Title Ins. Corp. v. Magnuson*, 487 F.3d 985 (6th Cir. 2007)).

Here, there is undisputed evidence directly tying Lumenate's damages to the Defendants' breaches of their non-compete obligations. The DPS Agreement prohibited the Individual Defendants from competing with Lumenate/DPS or soliciting Lumenate/DPS customers while employed and for a period of six months after their termination. (Docs. 63, Exs. 1-3). However, all but one of RDI's current customers are customers that the Individual Defendants solicited from Lumenate/DPS. (Doc. 109 at 43). Baker testified that he used Anderson, Hahn, and Newman to entice the customers to leave Lumenate: "I would say you have got the list of all the clients that moved over [from Lumenate to RDI], and in some capacity or a mix between Chris Anderson and Bill

---

[34] Defendants maintain that the fact that Lumenate lost revenue from nine customers does not establish the necessary causal connection, because none of the customers testified that they left Lumenate because Defendants solicited their business. In fact, Defendants cite to several customers who claim they left because they were dissatisfied with Lumenate's service. (Doc. 131, Ex. D at ¶ 8; Ex. E at ¶ 8). However, these declarations are irrelevant to the causation analysis. *See Shred-It USA, Inc. v. Mobile Data Shred, Inc.*, 238 F.Supp.2d 604 (S.D.N.Y. 2002) (no direct testimony of former clients is needed to establish proximate cause for damages of breach of non-compete).

Hahn and Gary Newman, I probably sold those clients and used those guys as part of the resource." (Doc. 109 at 41).  The Individual Defendants solicited clients not only within the six-month post-termination obligation, but also while still employed by Lumenate. (Doc. 107 at 185; Doc. 109 at 133-134).  Not only did Lumenate's clients terminate their contracts while the non-compete obligations were in force, but the Defendants coached them on when and how to do so.  (*See* Doc. 135, fn. 26).  Defendants also sent proposals, contracts, and engagement documents to Lumenate clients using documents that contained Lumenate's confidential information.  (*See, e.g.,* Doc. 135 at 21, fn. 27).

Accordingly, the Court finds, as a matter of law, that the Individual Defendants breached the DPS Agreement.

### 4.    *Damages*

Lumentate's expert, Matthew Morris, concludes that the Defendants' actions caused $13.3 million in potential economic damage.  (Doc. 115).  Randall H. Wilson's report concludes that Lumeante suffered economic damages totaling $8,134,901.  (Doc. 116).  The exact amount of damages is a disputed issue of fact that will be determined at trial.

### B.    Defendants' Motion for Partial Summary Judgment Regarding the Lumenate Agreement (Doc. 87)

Defendants move this Court for partial summary judgment as to two legal issues related to Claim Three in the Second Amended Complaint (breach of non-compete agreements).  Specifically, Defendants request a determination by this Court that, as a

matter of law: (1) any contractual relationship between Mr. Baker and Lumenate is set forth in Mr. Baker's Lumenate Agreement; and (2) Mr. Baker and Mr. Anderson's Lumenate Agreements did not and do not preclude them from soliciting their former DPS clients.

Prior to July 2013, Defendants were employed by DPS. (Doc. 1 at ¶ 12). In July 2013, Lumenate entered into an Asset Purchase Agreement ("APA") with DPS, pursuant to the terms of which Lumenate purchased substantially all of DPS's assets. (*Id.* at ¶ 19). According to the APA's terms, DPS terminated Mr. Baker, Mr. Hahn, and Mr. Anderson as DPS employees on the closing date of the APA. (*Id.* at ¶ 20). Coinciding with their termination from DPS, Lumenate offered Mr. Baker and Mr. Anderson positions with Lumenate. (Doc. 87, Ex. 2 at ¶ 3). As part of that offer, Lumenate presented Mr. Baker and Mr. Anderson with a form "Confidentiality, Non-Solicitation and Intellectual Property Agreement." (Doc. 63, Ex. 5 at PageID 1632).

The Lumenate Agreement included a non-solicitation and non-competition provision:

> [T]he Employee agrees that, during the Employee's employment and for a period of twelve (12) months after cessation of the Employee's employment with the Employer for any reason, the Employee agrees not to directly or indirectly through third parties solicit the business of, or engage in business with, the Employer's clients, vendors, customers, employees or other companies, individuals or entities with whom the Employer conducts business…

(Doc. 63, Ex. 5 at PageID 1630). The Lumenate Agreement contains an express limitation on the scope of this non-solicitation and non-competition provision which

states that "[t]his restriction is limited to (a) those persons, companies and other entities that the Employee first came into contact with, or learned about the existence of, while working for the Employer…"  (*Id.*)

At the end of August 2013, Baker and Anderson each signed the Lumenate Agreement.  (Doc. 63, Exs. 5-6).  Additionally, Baker completed an "Addendum A," identifying companies with whom he had relationships with prior to his employment with Lumenate.  (*Id.*, Ex. 5).  Baker returned his completed Lumenate Agreement on August 29, 2013.  (*Id.*)  Anderson also completed his Lumenate Agreement and returned it in August 2013.  (Doc. 63, Ex. 6).  Following the execution and return of their Lumenate Agreements, Baker and Anderson were both employed by Lumenate until their departure in November 2013.

The Lumenate Agreement contains a non-solicitation and non-competition covenant, but also contains an express limitation on the scope of that covenant: "This restriction is limited to (a) those persons, companies and other entities that the Employee first came into contact with, or learned about the existence of, while working for the Employer…"  Both Lumenate's CEO and its VP of Human Capital testified that the term "Employer," as defined by the Lumenate Agreement and as used in that Agreement, means Lumenate Technologies, LP.  (Doc. 99 at 101; Doc. 96 at 59).  Therefore, the restriction on solicitation does not reach companies that the employee "first came into contact with, or learned about the existence of" *prior to* working for Lumeante.

### 1. Counteroffer

Lumenate argues that by completing and returning his Addendum A, Mr. Baker changed the terms of the offer and thus made a counteroffer which Lumenate never accepted.[35] Defendants maintain that by completing Addendum A and returning it to Lumeante, Baker accepted Lumenate's offer and the Agreement bound both parties going forward. The Lumenate Agreement directed the employee "to identify in Addendum A, attached hereto and incorporated by reference, clients…with whom the Employee has had relationships prior to his or her employment with the Employer." (Doc. 63, Ex. 5). Baker did just that, and returned the Agreement to Lumeante. (*Id.*) The Lumenate Agreement does not say that the final agreement is "contingent upon Lumneate's review and approval of Addendum A."

Lumenate argues that there are genuine issues of material fact as to whether Baker's proposed Addendum A constituted a counteroffer that was rejected by Lumenate. Specifically, Lumenate maintains that the intent of the parties with respect to the additions to Addendum A are disputed issues.[36] However, the subjective intent of the

---

[35] While it seems counterintuitive that in an action for breach of contract, Lumenate would argue that it is not bound by the Lumenate Agreement, but the Agreement expressly permits Mr. Baker to solicit his former DPS customers in competition with Lumenate.

[36] Both Lumenate's CEO and its Vice President of Human Capital testified that Lumenate did not intend the Agreement to be binding until it accepted the terms of the employees' counteroffer on Addendum A. (Doc. 96 at 55; Doc. 99 at 76). Additionally, Lumenate argues that the evidence suggests Baker did not believe his Addendum A was accepted because when he began soliciting Lumenate clients, he tried to hide his solicitations by using his personal email address.

parties as a factual matter is irrelevant when interpreting the plain language of the agreement. "When the language of a written contract is clear, a court may look no further than the writing itself to find the intent of the parties." *Westfield Ins. Co. v. Custom Agri. Sys.*, 979 N.E.2d 269, 271 (Ohio 2012) (citing *Alexander v. Buckeye Pipe Line Co.* (1978), 374 N.E.2d 146, paragraph two of the syllabus). Here, the language of the Lumenate Agreement provided that Baker could, and indeed had to, fill out Addendum A when he signed the Agreement. By the plain language of the Agreement, it is clear that Lumenate intended for Baker to list his pre-Lumenate clients on Addendum A. Baker did that, signed the Lumenate Agreement, and both Lumenate and Baker were bound by it. Therefore, Lumenate cannot now claim it was not bound by the Agreement.

### 2.    *Absurd Results*

Next, Lumenate argues that to limit the scope of its non-solicitation provision according to its express terms "makes no sense," because the plain language of the Lumenate Agreement expressly permits solicitation of former DPS customers in competition with Lumeante. Defendants maintain that Lumenate's limitation makes perfect sense, because it offers a balance between the interests of employees and

---

(Doc. 86, Exs. 8, 17). However, in January 2014, Lumenate sent Mr. Baker a letter threatening him with legal action related to his ongoing business activities with RDI. (Doc. 39, Ex. 7 at PageID 1114-1120). Lumenate attached a copy of Mr. Baker's Lumenate Agreement and warned him not to violate it. (*Id.* at PageID 115 ("The purpose of this letter is to provide all interested parties with formal notice of the existence of the Lumenate Agreement.")). Therefore, even Lumenate asserted that it had an Agreement with Mr. Baker.

employers that Ohio law requires in disfavored restrictive covenants.[37]

In light of Ohio's disfavor of restrictive covenants, the Court finds that it is not absurd to read the Agreement's restrictions on non-solicitation as an attempt to balance Lumenate's legitimate interest in protecting its future customer relationships with the recognition that restrictions must meet various *Raimonde* factors, including the consideration that its new employees should be able to take advantage of relationships that they developed prior to working for Lumenate if they leave Lumeante.  Moreover, if Lumenate wanted to bind its new/former DPS employees from soliciting or doing business with their former DPS customers, they could have changed the language of the Agreement.  It is not the responsibility or function of this Court to rewrite the parties' contract in order to provide for a more equitable result.  A contract "does not become ambiguous by reason of the fact that in its operation it will work a hardship upon one of the parties thereto."  *Ohio Crane Co. v. Hicks*, 143 N.E. 388, 389 (Ohio 1924).

The Lumenate Agreement asked Mr. Baker "to identify in Addendum A, attached hereto and incorporated by reference, clients…with whom the Employee has had relationships prior to his or her employment with the Employer," and states that "[t]he Employee is not restrained from soliciting or engaging in business with these clients."

---

[37] "A covenant restraining an employee from competing with his former employer upon termination of employment is reasonable if the restraint is no greater than is required for the protection of the employer, does not impose undue hardship on the employee, and is not injurious to the public…[C]ourts must determine whether the restraints and resultant hardships on the employee exceed what is reasonable to protect the employer's legitimate business interests." *Raimonde v. Van Vlerah*, 325 N.E.2d 544 (Ohio 1975), paragraph one of the syllabus.

(Doc. 63, Ex. 5 at PageID 1630-31).  If Lumenate intended to include DPS in the definition of "Employer," it had the opportunity to do so.  In fact, former DPS employee and president, Mr. Loock, listed "DPS Client List," "DPS Vendor List," and "DPS Business Partners" on his Addendum A.  (Doc. 83, Ex. 244 at 4).  Therefore, even DPS's President understood that his DPS relationships were "pre-existing relationships that [he] wanted to protect for [his] benefit."  Lumenate even made changes to the Agreement that it offered to former DPS employees.  (Doc. 96, Ex. 49) ("[A]ttached you will find the New Lumenate Confidentiality, NonSolicitation and Intellectual Property Agreement for your review and signature.  This document now takes the place of the former Agreement provided earlier with your offer letter.").

Therefore, the Court finds, as a matter of law, that the Lumenate Agreement did not preclude either Mr. Baker or Mr. Anderson from "soliciting or engaging in business with" their former DPS clients.[38]  The Court declines to find that the only contractual

---

[38] This finding is further supported by a Non-Disclosure/Confidentiality, Non-Solicitation and Non-Compete Agreement that David DeYoung, Lumenate's Vice President of Business Development signed.  Specifically, Addendum A of that Agreement states: "This Addendum A identifies those clients, who utilize business services and products similar to those provided by the Company, that the Employee has had relationships with prior to his or her employment with the company.  The Employee is not restrained from soliciting these clients after cessation of the Employee's employment with the Company, except those who, during the Employee's employment by the Company, have become clients or customers of the Company."  (Doc. 148, Ex. 1).  In the DeYoung Agreement, Lumenate made clear that DeYoung was only precluded from soliciting his former clients if they became clients of Lumenate.  Lumenate could have included that same restriction in 2013 when it offered Mr. Baker and Mr. Anderson employment, but it did not.  Instead, they were simply directed to "identify in Addendum A … clients … with whom the Employee has had relationships prior to his or her employment with the Employer." (Doc. 63, Ex. 5 at PageID 1630-31).  Moreover their version of the Addendum A informed them that they were "not restrained from soliciting or engaging in business with these clients."  (*Id.* at PageID 1631).

relationship between Mr. Baker and Lumeante is set forth in Mr. Baker's Agreement, because Mr. Baker is also bound by the terms of the DPS Agreement.

### C. Defendants' Motion for Summary Judgment Regarding the DPS Agreement (Doc. 89)

Defendants move for partial summary judgment as to three legal issues related to Claim Three in the Second Amended Complaint (breach of non-compete agreements). Specifically, Defendants request a determination by this Court that as a matter of law: (1) Defendants' DPS Agreements were not assignable to Lumenate; (2) even if they were assignable, the express terms of the DPS Agreements prohibit Lumenate from enforcing them now; and (3) Mr. Hahn's DPS Agreement is unenforceable because he justifiably relied on representations that it was not enforceable.

Defendants each executed non-compete agreements with DPS. (Doc. 63, Ex. 2 at PageID 1618; Ex. 1 at PageID 1616; Ex. 3 at PageID 1620). The DPS Agreements contain a non-disclosure provision and a noncompetition provision. The non-competition provision states in pertinent part that employees shall not

> own, operate or be in the employ of any business which is located in or which sells products or services within the Territories (or any portion thereof) or any area within fifty (50) miles of the Territories (or any portion thereof) which are comparable to or competitive with any products or services which are now or are hereafter provided by DPS.

(*Id.*) The term "Territories" is defined as "the DPS offices located within the limits of the following cities…and all other cities in which DPS may hereafter have an office…" (*Id.*) The DPS Agreements are silent with respect to assignability. (*Id.*)

26

According to the APA's terms, DPS terminated Mr. Baker, Mr. Hahn, and Mr. Anderson as DPS employees on the closing date of the APA.  (Doc. 1 at ¶ 20).  After Lumenate purchased DPS's assets, Lumenate offered Baker, Hahn, and Anderson positions.  Hahn refused Lumenate's offer, resigned his position, and became employed by RDI. (Doc. 103 at 40-41, 44).  Baker accepted Lumenate's offer, but resigned after two months and became employed by RDI.  (Doc. 102 at 37).  After brief employment with Lumenate, Anderson also resigned and joined RDI.  (Doc. 92 at 181; Doc. 107 at 19-20).

Lumenate argues that the DPS Agreements where assigned to them pursuant to the terms of the APA.  (Doc. 63 at ¶¶ 33-35).  Lumenate alleges that as a result of the assignment, Lumenate can enforce the DPS Agreements against the Defendants.  (*Id.*)  Defendants argue that the parties to the DPS Agreements never intended for the agreements to be assignable, and even if they were assignable, they are unenforceable by Lumenate.

### 1.      Whether the Agreements Were Assignable

Defendants argue that they did not have a contract with Lumenate, because the DPS Agreements were not assignable to Lumenate.  *See, e.g., Managed Health Care Assoc. v. Kethan*, 209 F.3d 923, 926 (6th Cir. 2000) (the assignability of a contract "is a question of law properly resolved by the Court.").  Defendants maintain that since the DPS Agreements were not assignable, Lumenate's breach of contract claim fails as a matter of law.

Defendants argue that a restrictive covenant is not assignable without the consent of the employee.  *W.R. Grace & Co. v. Hargadine*, 392 F.2d 9, 20 (6th Cir. 1968). However, Ohio law is clear that non-compete agreements are assignable without the employee's consent.  "[N]on-compete agreements may still be assignable notwithstanding silence in the agreement as to assignability and even absent the employee's consent."  *Fitness Experience*, *Inc.*, 355 F.Supp.2d at 887-88.  When a restrictive covenant is silent as to assignability, the court must ascertain the parties' intent by determining: (1) whether the covenant employs words which indicate that assignment was contemplated; and (2) whether assignability is necessary to protect the goodwill of the business being sold.  *Id.* at 889.

First, Defendants argue that the DPS Agreements are limited to DPS and therefore did not contemplate assignability.  Defendants maintain that the DPS Agreements refer to DPS without using a generic term such as "Employer," which indicates that the Agreements were intended to be limited to DPS and not assignable.  Additionally, Defendants argue that the non-competition language refers to the employer's location and business and expressly prohibits employees from being employed by businesses "comparable to or competitive with … any products or services which are now or are hereafter provided by DPS."  However, as this Court discussed in its Order denying Defendants' partial motion to dismiss (Doc. 35 at 7-8), the non-compete agreements in *Fitness Experience* identified both the employer and employee by name (as opposed to generically referring to "employer" and "employee").  355  F.Supp.2d at 889 ("[…] the

non-compete agreement specifically applies to Exercare [the employer] and each individual defendant rather than referring generically to their respective roles as employer and employee"). In contrast, the DPS Agreements only refer to "DPS" by name. (Doc. 63, Exs 1-3). As this Court has already held, "Defendants cannot have it both ways – if the use of 'DPS' evidences intent of non-assignability, then the use of 'Employee' evidences intent of assignability." (Doc. 35 at 7). This Court also previously rejected Defendants' arguments pertaining to geographic restrictions. (*Id.* at 8). Accordingly, for the same reasons that Defendants' arguments failed at the motion to dismiss stage, they fail again now.

The court in *Fitness Experience* also examined "the goodwill of the business being sold … in order to weigh this factor's effect on evincing the parties' intent regarding assignability." 355 F.Supp.2d at 890. To determine whether assignability is necessary to protect "goodwill," courts should "consider the nature of the business and the particular employee's position." *Id.* Defendants argue that the assignment of the DPS Agreements was not intended to protect DPS's goodwill, since Lumenate "actively dismantled it" by making clear that it was not interested in retaining former DPS customers. (Doc. 89 at 11; Doc. 97 at 11, 152).[39] Not only does the express language of the Agreements

---

[39] Defendants improperly focus on post APA events and the current dispute. *Fitness Experience* notes that since the goodwill "analysis is directed as ascertaining the intent of the Individual Defendants and Exercare at the time they entered into the agreement, events subsequent to Fitness Experience's asset acquisition are irrelevant." 355 F. Supp.2d at n. 24.

acknowledge the importance of the goodwill that the Agreements sought to protect,[40] the Defendants admit that the managed services business is dependent on a few key clients and the Individual Defendants' relationships to those clients. (Doc. 103, Ex. 2 at 72-73). Accordingly, the undisputed facts and the actual language of the DPS Agreements confirm that assignability was necessary to protect the goodwill of DPS's business.

Therefore, the Court finds that the DPS Agreements were assignable to Lumenate.

## 2. *Terms of the DPS Agreements*

Next, Defendants argue that even though a non-compete agreement may be assignable, the express words of any assigned non-compete agreement limit enforceability. Defendants cite *Mid-West Presort Mailing Servs., Inc. v. Clark*, No. 13215, 1988 Ohio App. LEXIS 615, at *4 (Ohio App. Feb. 10, 1988), in support of their argument. In *Clark*, the court determined that even a proper "[a]ssignment of a restrictive covenant…does not automatically mean that the covenant is enforceable by [the assignee]." *Id.* at 4-5. The court determined that the assigned agreements were not enforceable by the third-party purchaser because of the express language in the agreement. Specifically, the court stated:

> In the present case, the terms of the restrictive covenant prohibited [the seller's former employees] from competing with any then existing branch or operation of [seller]. Even after the sale of assets to [purchaser], [seller]…retained its independent corporate existence.

---

[40] "Employee acknowledges that such confidential information is a valuable commercial asset of DPS, that its use provides DPS with a significant competitive advantage and that the retention by DPS of its customers is vital and indispensable to the conduct of its business." (Doc. 63, Exs 1-3).

> The trial court found that [the former employees] were not in violation of the terms of the restrictive covenants because they were competing with [purchaser] which was not a branch or operation of [seller]. Therefore, the court found, enforcement of the restrictive covenants would not prevent unfair competition with the former employer, but rather would result in an unnecessary restraint of trade by preventing [seller's former employees] from competing with a third party.

*Id.* at 5-6.

However, *Clark* is distinguishable from this case because the appellate court specifically rejected the trial court's broad holding that a restrictive covenant in an employment agreement is never enforceable after transfer to a third party:

> Although we disagree with the trial court's determination that a restrictive covenant in an employment contract is never enforceable after transfer of the business from the employer to a third party, we hold that the trial court did not commit reversible error by concluding that enforcement of the restrictive covenants in question was unreasonable and unnecessary to protect Technisort's business interests.

*Clark*, 1988 Ohio App. LEXIS 615 at 3.  Instead of simply focusing on whether an agreement identifies future assignees by name or reference, the *Clark* court made clear that "enforcement of a restrictive covenant by a third party will depend upon the circumstances and equities of each individual case." *Id.* at 2.  Moreover, Ohio courts have expressly held that even employment agreements that are silent as to assignability may be enforced by assignees. *Blakeman's Valley Office Equip., Inc. v. Bierdeman*, 786 N.E.2d 914, 917-18 (Ohio App. 2003).

Accordingly, the express terms of the DPS Agreements do not prohibit Lumenate from enforcing them now.

### 3.      Mr. Hahn's DPS Agreement

Finally, Defendants argue that Mr. Hahn's DPS Agreement is unenforceable because he justifiably relied on representations that it was not enforceable. Specifically, Defendant Hahn maintains that before Lumenate and DPS executed the APA, Cynthia Kirker, the HR Director for DPS, informed him that the non-competition obligations in his DPS Agreement would not be enforceable after the sale. Hahn claims that he was told that it was DPS's practice not to enforce the non-competition obligations in its Agreements when an employee was terminated. (Doc. 89, Ex. 2 at ¶ 4). Mr. Hahn maintains that he relied on Ms. Kirker's representations. Defendants argue that if the DPS Agreements are assignable and enforceable by Lumenate, such that Lumenate assumes DPS's contractual rights, Lumenate should also assume the responsibility of the promises DPS made to its employees and Lumenate should be estopped from enforcing the DPS Agreement against Mr. Hahn.

### a.      Affidavit is contradicted by deposition

Ms. Kirker's alleged statements to Hahn were made prior to the July 31, 2013 APA (at least six months before this litigation began), and yet despite extensive discovery, Hahn's Affidavit is the first time Defendants have revealed that Ms. Kirker allegedly made such statements. Specifically, during his deposition, Hahn was asked why he thought that the DPS Agreement was not transferred to Lumenate. (Doc. 103 at

95-86, 99). Hahn answered that it was his "personal belief" because he had "never agreed that it was to be transferred," "never had an understanding that it would be transferred," and that he was "terminated [by DPS,] [s]o I have a termination letter." (*Id.*) Hahn never referenced Ms. Kirker's alleged statements or that any such statements were sources of his belief as to the non-transferability/non-enforceability of his DPS Agreement. (*Id.*) Accordingly, Hahn's Affidavit is directly contradicted by his own prior deposition testimony.[41]

### b. Estoppel Claim

Even if the Court accepts Hahn's Affidavit as true, Defendants have failed to state a valid estoppel claim. Under Ohio law, a party claiming equitable estoppel must prove: "(1) that the defendant made a factual misrepresentation; (2) that it is misleading; (3) [that it induced] actual reliance which is reasonable and in good faith; and (4) [that the reliance caused] detriment to the relying party." *Helman v. EPL Prolong, Inc.*, 743 N.E.2d 484, 495 (Ohio App. 2000).

Hahn alleges that Ms. Kirker made statements while she was a DPS employee and that such statements pertained to DPS's "general practices." (Doc. 89, Ex. 2 at ¶ 4). Defendants fail to allege that any of these statements were made by Lumenate or pertain to Lumenate's "general practices." Moreover, Hahn's Affidavit fails to allege that he

---

[41] Defendants argue that Hahn's deposition testimony related to Lumenate and his declaration related to DPS, and thus there is nothing inconsistent about the testimony.

ever *relied* upon Ms. Kirker's alleged statements.[42]  In fact, the evidence supports a

finding that Hahn did not rely on the alleged statements.  For example, Hahn sent an

email to Trebbi after a customer mistakenly notified Lumenate about RDI's solicitation

efforts stating: "It would appear the first shot across the bow has been fired.  Have all the

clients signed the 'We solicited you' letter?"  (Doc. 94, Ex. 103).  Additionally, Hahn

sent an email to Dave Schulz stating that he was "[j]ust keeping low until non-compete

runs out."  (Doc. 95, Ex. 12).

Accordingly, Defendants fail to prove, as a matter of law, that Mr. Hahn's DPS

Agreement is unenforceable

## VII.   CONCLUSION

Accordingly, for these reasons:

1.  Plaintiff's partial motion for summary judgment (Doc. 101) is **GRANTED:**
    Baker, Hahn, and Anderson breached the terms of the DPS Agreement;

2.  Defendants' partial motion for summary judgment (Doc. 87) is
    **GRANTED IN PART** and **DENIED IN PART**.  Specifically:
    Baker and Anderson's Lumenate Agreements did not and do not preclude
    them from soliciting their former DPS clients; and

3.  Defendants' partial motion for summary judgment (Doc. 89) is **DENIED:**
    The DPS Agreements were assignable to Lumenate; the express terms of the
    DPS Agreements do not prohibit Lumenate from enforcing them now; and
    Defendants fail to prove, as a matter of law, that Mr. Hahn's DPS Agreement
    is unenforceable.

---

[42] Defendants argue that Hahn did in fact rely on Kirker's representations.  However, the cited
deposition testimony does not support the same: "You know, I had heard different people talk.
My opinion was I was terminated.  I did not believe that, you know, it would survive termin-
ation, nor did I believe that the non-compete transferred over, because that was never told to us."
(Doc. 113 at 120).

**IT IS SO ORDERED**.

Date:  12/28/15                                         *s/ Timothy S. Black*
                                                       Timothy S. Black
                                                       United States District Judge